# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

**FILED**

99 MAY 26 PM 4: 12

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JAMES CROSBY, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV 97-N-0599-S |
| | ] | |
| BOARD OF TRUSTEES OF THE | ] | |
| UNIVERSITY OF ALABAMA, et al., | ] | |
| | ] | |
| Defendant(s). | ] | |

**ENTERED**

MAY 27 1999

## MEMORANDUM OF OPINION

### I.    INTRODUCTION.

The plaintiff, James Crosby ("Crosby"), brings this employment discrimination action

against his former employer, the Board of Trustees of the University of Alabama (the

"Board"), alleging that he was paid less than other employees who performed the same job

because of his race. Mr. Crosby has also named as defendants the members of the Board

in their official capacities, along with the Associate Vice President of Facilities at the

University of Alabama at Birmingham, James Garland ("Garland"). Mr. Crosby brings

claims against the Board pursuant to Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e *et seq.* ("Title VII"). Mr. Crosby also brings claims against the remaining

defendants pursuant to 42 U.S.C. § 1983 for violations of rights under the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §

1981.[1] The individual defendants are sued in their official capacities for declaratory and

---

[1] As plaintiff's complaint recognizes, his section 1981 claim must be brought via the "vehicle" of section
1983. *See* Complaint ¶ 1. "[T]he express 'action at law' provided by § 1983 for the 'deprivation of any rights,
privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy



injunctive relief.[2] Defendant Garland is also sued in his individual capacity for money damages.

The matter is presently before the court for consideration of the defendants' motion for summary judgment, filed July 31, 1998, and for reconsideration of defendant Garland's motion for dismissal or summary judgment[3] on the individual capacity claims against him, filed April 11, 1997. The motions have been fully briefed and are ripe for decision. Upon due consideration, they will be denied.

## II.   STATEMENT OF FACTS.[4]

Viewed in the light most favorable to the plaintiff, the record before the court on summary judgment suggests the following version of events. The plaintiff Crosby began working for the University of Alabama at Birmingham, which operates under the auspices of the Board, in 1981. He initially was hired as an assistant project coordinator, charged with assisting the project coordinators with coordination of UAB's construction projects. In 1990, Mr. Crosby was promoted into a full-fledged project coordinator position.

---

for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989). This means that plaintiff's claim is properly characterized as a section 1983 claim, though based not directly on the constitution but on the contractual rights specifically guaranteed by section 1981.

[2] It appears that Mr. Crosby is no longer employed by the Board, which may render much if not all of the injunctive relief sought moot. Neither party has yet raised this issue, however.

[3] The language of the motion is not entirely clear, but it appears that Mr. Garland intended to move both for dismissal for failure to state a claim and for summary judgment.

[4] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2

While UAB's organizational structure has shifted slightly over the years of Crosby's employment, for almost all of the time period at issue the project coordinators reported directly to Leonard Dean, UAB's Director of New Construction. One step up in the chain of command was UAB's Director of Operations - Facilities Planning, a post held by Bill Braswell for most of the relevant time frame. The defendant James Garland, in one position or another, oversaw the facilities and construction department from 1979 through all times that are material to this action.

A number of different project coordinators were employed by UAB during this same period. It is undisputed that all of them, except for the plaintiff, were white, and that UAB consistently paid them all higher salaries than it paid the plaintiff. However, it is also undisputed that all of the other project coordinators who worked for UAB during this time had more construction-related education than the plaintiff,[5] and all but one had more construction experience. That individual, Bob Morgan, had a year less total experience in construction than Crosby[6] and was also the project coordinator most similarly situated to the plaintiff in terms of education. In addition to Crosby's high school education, Morgan had some college courses in basic math and science and construction-related courses in drafting. However, he had no coursework in construction engineering or management and,

---

[5] The record suggests that Glenn Shaw, a project coordinator who retired before Crosby was promoted, might have had only a high school education as well. *Dean Depo.* at 35-36. However, neither party seems to assign any significance to this fact, so the court will not dwell on it.

[6] That experience was slightly different than Crosby's, as well. Crosby's experience involved project coordination for UAB, primarily on building renovations. Morgan's experience involved a number of other employers and was more varied, in that it involved some (though apparently not much) experience working on new building construction, and required skills other than project coordination, for example drafting. By the same token, however, Morgan's pre-UAB experience was less directly related to the tasks he performed at UAB than Crosby's on-the-job experience, because none of Morgan's prior positions involved the coordination of construction for the building's owner. *See Morgan Decl.* ¶ 4-9.

3

like several of the other project coordinators, had not completed the requirements for any post-high school degree. *See Morgan Decl.* ¶ 2.

Mr. Garland, the man ultimately responsible for determining the project coordinators' salaries for much, if not all, of the relevant time period, contends that the disparity in pay between Crosby and the other project coordinators was the result of their relative levels of education and experience. According to Garland, the "limitations in Mr. Crosby's education[7] and experience" limited his "assignments . . . to University Hospital renovation projects," as opposed to new building construction. *Garland Aff.* ¶ 8. These "limitations . . . on the assignments that he is qualified to undertake" in turn explain Crosby's lower rate of pay. *Id.* ¶ 9. Garland testified that Crosby's immediate supervisors, Braswell and Dean, confirmed that Crosby was not qualified to handle major new building construction. *Garland Depo.* at 151-56, 169-73. Alicia Jones, the UAB compensation supervisor who investigated Crosby's claims of discrimination, testified that Braswell and Dean told her the same thing. *See also Depo. of Alicia Jones, Vol. II,* at 27-42, 45-46. It is undisputed that Crosby performed almost exclusively hospital renovation work, and was involved with few if any new building construction projects. Ms. Jones therefore concluded, as the defendants contend here, that Crosby was limited to renovation work assignments and paid accordingly. *Id.* at 32-33.

---

[7] Specifically, Garland testified that there are a number of core courses including a course in structural design, several courses in structural engineering, courses in electrical and mechanical design, and courses in construction scheduling which were necessary to provide the knowledge base for coordination of a full-scale ground-up construction project and for which experience is not a satisfactory substitute. *Garland Depo.* at 202-03, 232-34, 540-543.

4

Braswell and Dean tell a much different version of the story. They both claim that they never told Garland, or anyone else, that Crosby was not qualified to handle major projects. *Braswell Depo.* at 123-24, 143-44; *Dean Depo.* at 166-67; *Braswell Decl.* ¶ 36, 42; *Dean Decl.* ¶ 50, 55. Indeed, Braswell and Dean have testified that they felt that Crosby was qualified to perform any project, and that Garland himself never said otherwise. *Braswell Depo.* at 117-20, 123-24, 143-44; *Dean Depo.*[8] at 98, 166-67; *Braswell Decl.* ¶ 36, 42; *Dean Decl.* ¶ 50, 55. According to these supervisors, project assignment decisions were not usually made on the basis of education and general construction experience. These choices were instead based primarily on each coordinator's work load and expertise with particular departments and geographic areas of the University. *Braswell Depo.* at 20-28; *Dean Depo.* at 87-94. Nor were there any special limitations on Crosby's assignments imposed by Garland or anyone else. According to Braswell and Dean, Crosby was regularly assigned to hospital renovation projects, not because of any limitations, but because of his extensive experience with this aspect of UAB construction, the "exceptional ability" he demonstrated at the difficult job of coordinating construction with patient care, and his "excellent rapport" with the hospital staff. *Dean Decl.* ¶ 62; *see Braswell Depo.* at 20-22; *Dean Depo.* at 106-07; *Braswell Decl.* ¶ 36; *Dean Decl.* ¶ 50; Braswell and Dean also expressed the opinion, echoed by several project coordinators, that coordination of such hospital renovations was as much if not more complicated than managing the construction of a new building, largely because hospital renovation projects require a coordinator to

---

[8]Dean did testify that he was told relatively early in Crosby's tenure at UAB that, because of inexperience, Crosby should not be assigned to handle major projects on his own. However, as Crosby developed experience, Dean assigned him larger projects, and Dean claims that he was never told not to do so. *Dean Depo.* at 98.

5

reconcile construction demands with the on-going requirements of patient care.[9] *Braswell Depo.* at 80-83; *Dean Depo.* at 29-31, 92, 117-25; *Morgan Decl.* ¶ 37, 39; *Sego Decl.* ¶ 13-15, 17-18, 30-31; *Dean Decl.* ¶ 19, 35.

Braswell and Dean also claim to have fought a running battle with Garland over Crosby's status with the UAB construction group. According to their version of events, Crosby was successfully performing the duties of a full-fledged project coordinator long before his title was changed to reflect this fact, and Braswell, Dean, and others lobbied for his promotion for years before Garland finally agreed to it. *Dean Depo.* at 22-29, 31-33; *Braswell Decl.* ¶ 27; *Dean Decl.* ¶ 39. Later, they became concerned with the disparity in pay between Crosby and the other project coordinators, and with Garland's apparent reluctance to grant Crosby even the raises indicated by standard UAB policy. They advised Garland to do something about the pay disparity, occasionally going so far as to indicate that the pay differential might be discriminatory. *Braswell Depo.* at 43, 67-74; *Dean Depo.* at 117, 152; *Dean Decl.* ¶ 40; *Plaintiff's Exh. C* (letter from Braswell to Garland).

---

[9] The parties have eaten up innumerable pages debating in almost mind-numbing detail the relative complexity of renovation and ground-up construction projects. The court has wasted more hours than it would like to count wading though the resulting swamp in order to put itself in the position to offer the following simple summary. Defendants' position: Ground-up construction is more technically complex than renovation construction, and requires more engineering knowledge to understand. Plaintiff's position: 1) The technical content of a project is not that important, because the task of a project coordinator is communication and administration. Experts are on hand to handle technical issues; 2) Coordination is actually more difficult in renovation projects, because life must go on around the construction. As the discussion below reveals, this simplified version of the facts is more than sufficient for the court to decide the issues presented. Summary judgment is not won or lost on the weight of the parties' submissions, nor is victory determined by counting pages. Instead, the court must strip the case down to its factual essence in order to decide the legal questions presented, which after all are the only questions the court can answer. Counsel can choose to help in this process by focusing only on facts which are directly legally relevant, or they can decide to waste the court's time by recitation of detail and nuance which may impress a jury but has no impact on the analysis the court must perform. While the court will not be daunted by the latter tactic, and will spend the time necessary to construct a useful version of the facts for itself, the need to do so is invariably irritating and unlikely to engender warmth and sympathy for the parties and their counsel. The court hopes that counsel on both sides will keep that in mind in formulating their factual submissions in the future.

6

These efforts were to no avail. Crosby's salary remained noticeably below that of the other project coordinators, and Braswell and Dean ultimately came to the conclusion that Garland had in fact discriminated against the plaintiff. *Braswell Depo.* at 37-41; *Dean Depo.* at 153-55; 161-62.

Mr. Crosby apparently reached the same conclusion. He filed a complaint with the EEOC on November 20, 1995, and, after the usual administrative preliminaries, followed it with the complaint in this action on March 10, 1997.

## III.    SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Where the nonmoving party will bear the burden of proof at trial, there is no requirement, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323. "Instead, the moving party simply may '"show[ ]"'--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *United States v. Four*

7

*Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir.1991) (*en banc*) (quoting *Celotex*, 477 U.S. at 324); *see also Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (same); *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995). However, "it is never enough simply to state that the non-moving party can not meet its burden at trial." *Clark v. Coats and Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must instead make an "affirmative showing" that crucial evidence is missing "by reference to any combination of the following: pleadings; deposition testimony of a party or its witnesses; affidavits; responses to interrogatories . . . ; requests for admission . . . ; and any other exchanges between the parties that are in the record." *Cheatwood v. Roanoke Industries*, 891 F. Supp. 1528, 1533 (N.D. Ala. 1995) (Hancock, J.).

"Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels of Real Property*, 941 F.2d at 1437-38 (11th Cir.1991).

At this stage, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. *Id.* at 324. The nonmoving party must make a specific, affirmative

8

showing that a genuine factual dispute exists. If the required showing is not made, "summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

After the plaintiff has responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the

9

evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   THE MCDONNELL DOUGLAS FRAMEWORK.

Title VII of the Civil Rights Act of 1964 provides, in part, that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). In order to prevail on a claim of race discrimination under Title VII, the plaintiff must prove that the Board acted with a discriminatory purpose,[10] and that this purpose affected the terms and conditions of his employment. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).

---

[10] Where an entity like the Board is concerned, this means that an agent of the Board acted with discriminatory intent under circumstances in which the Board can be held responsible for that agent's conduct.

10

To make out his claims pursuant to 42 U.S.C. § 1983 against the individual defendants, Mr. Crosby must demonstrate that they acted "under color of any statute, ordinance, regulation, custom, or usage of any State" to deprive him of any "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Mr. Crosby claims that the defendants violated his Fourteenth Amendment right to equal protection under the laws, and violated the rights guaranteed by section 1981 by depriving him of equal contractual opportunities for racial reasons. These claims are tested under the same standards applied to Title VII race claims. "When section 1983 is used as a parallel remedy for violation of section 703 of Title VII the elements of the two causes of action are the same." *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1980)) (discussing equal protection); *see Busby v. City of Orlando*, 931 F.2d 764, 771-72 n.6 (11th Cir. 1991) (the Equal Protection clause already provides protection as broad or broader than section 1981, so a section 1981 claim is essentially duplicative and "we need not address it separately"). All of plaintiff's claims must therefore rise or fall together, and the following discussion of the controlling legal principles is applicable to all claims.

Plaintiff has presented only circumstantial evidence of racial discrimination, so the familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs this court's inquiry.[11] Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a claim based on circumstantial evidence first must bear the burden of

_____

[11] Plaintiff has not offered any direct evidence of discrimination or any proper statistical evidence, making only generalized claims that UAB treated minority employees and contractors differently. The plaintiff has therefore waived any claim not based on circumstantial evidence.

11

establishing a *prima facie* case of discrimination. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring the defendant to articulate some "legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original).

The plaintiff may prove that the defendant intentionally discriminated against her "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

12

unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). However, "'to withstand a defendant's motion for summary judgment, a plaintiff has to do more than establish a prima facie case and deny the credibility of defendant's witnesses.'" *Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir. 1994) (quoting *Brown*, 939 F.2d at 950). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). Plaintiff must instead "produc[e] sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable."[12] *Howard*, 32 F.3d at 526.

If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). Because of the difficult factual questions involved in assessing "an employer's true motivations," once the plaintiff has presented evidence raising a question about those motivations, summary judgment is ordinarily inappropriate. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

---

[12]In other words, a defendant can carry its initial burden on summary judgment on the pretext issue by presenting extensive proof to support its legitimate nondiscriminatory reason. If the defendant can show that its preferred reason was the real reason, it need not prove a negative by showing that the plaintiff can not prove pretext. Pretext and a legitimate reason are, after all, two sides of the same coin. Proof of one disproves the other.

13

If evidence in the record "demonstrate[s] 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's preferred legitimate reasons for its action that a legitimate factfinder could find them unworthy of credence,'" the final assessment of the employer's motivation must be left to the jury. *Combs*, 106 F.3d at 1538.

## V.   DISCUSSION.

### A.   Racial Discrimination.

#### 1.   Prima Facie Case.

In this case, Mr. Crosby relies exclusively on a claim of discrimination in pay. To make out his *prima facie* case, Mr. Crosby must first identify specific actions by the defendants which adversely affected the terms and conditions of his employment, and then match these actions with "facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). While the requirements of the *prima facie* case have been described as "minimal," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993), and "not onerous," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981), they "serve[] an important function" by "eliminat[ing] the most common nondiscriminatory reasons for" the plaintiff's treatment. *Id.* at 253-54. Once these explanations are eliminated, the court can then presume that the defendants' acts, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 254.

Naturally, the facts which might raise such an inference vary depending on the circumstances in which the defendants acted, so that the *prima facie* case concept is

14

flexible and the elements may vary from case to case. Generally, however, to make out a
claim of race discrimination based on circumstantial evidence, the plaintiff must show that
he was not treated in the same way as other similarly situated employees of different races.
The similarity requirement itself eliminates the most common reasons for the plaintiff's
treatment, allowing an inference of discrimination to be drawn.

However, disputes often arise over how close a comparison the plaintiff must be
able to draw between himself and another employee in order to make out a *prima facie*
case. This case is no exception. The parties strenuously disagree over the proper
approach to the similarity question, disputing both what factors should be considered in
assessing similarity and the ultimate outcome of that analysis.

A plaintiff can establish a *prima facie* case of pay discrimination by demonstrating
that he is a member of a protected class and that the "job []he occupied was similar to
higher paying jobs occupied by" other employees who were not members of the same
class.[13] *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992);

---

[13]Defendants argue for the application of a different *prima facie* case, set out in *Daniel v. Church's Chicken*, 942 F. Supp. 533, 538 (S.D. Ala. 1996). Under the *Daniel* standard a plaintiff must show that he asked for and was denied a *particular* raise in order to make out a claim of discrimination. Specifically, the plaintiff must establish "(1) that []he belongs to a racial . . . minority; (2) that []he asked for and was qualified for a raise, (3) that despite h[is] qualifications []he was denied a raise, and (4) at the time []he was denied additional compensation the pay of [employees in the same position] of a different race . . . was higher than what [he] received." *Id.* Defendants argue that because the plaintiff does not complain about his starting salary with the University, what he is really claiming is that he should have been given a raise, making *Daniel's* "raise" test, rather than the more general approach enunciated by the Eleventh Circuit for pay cases, the appropriate standard to govern this case. This court is not persuaded. Virtually every pay case can be deconstructed into a claim that a raise should have been given at some point. Perhaps for this reason neither *Daniel* nor the relevant appellate cases make any distinction between raise cases and pay cases. The court is therefore bound by the Eleventh Circuit's version of the *prima facie* case, and must reject the test proposed in *Daniel*. Even if the court were not so bound, it would find the *Daniel* test, plainly based on the traditional *prima facie* requirements in a promotion case, unsuited for pay discrimination cases. In particular, the court finds an "application" for a raise unnecessary to raise the required inference of discrimination. While aggressive employees may sometimes request raises, in general employers can and do assume that their employees would like to be paid as much as possible. Employers therefore monitor pay levels via their supervisors, without needing (or probably wanting) direct input

15

*see Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 598 (11th Cir. 1994), *cert. denied*, 513 U.S. 919 (1994); *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1569 (11th Cir. 1993), *reh'g denied*, 996 F.2d 316 (1993); *Pittman v. Hattiesburg Mun. Separate School Dist.*, 64 F.2d 1071, 1074 (5th Cir. Unit A 1981) ("plaintiff must show that he was paid less than a member of a different race was paid for work requiring substantially the same responsibility"). The defendants concede that the plaintiff is a member of a protected class, but make a two-pronged argument that the plaintiff cannot meet the other requirements of his *prima facie* case. Defendants contend that because Crosby worked almost exclusively on renovation projects, his job is not "similar" to that of the other project coordinators, and that his inferior education and other qualifications bar any comparisons between his pay and theirs.

The level of job similarity required to make out a pay discrimination case is, like so many other standards in the law, difficult to define precisely. We do know that the standard is more "relaxed" than that applied to a claim under the Equal Pay Act (EPA). *Miranda*, 975 F.2d at 1526, 1529 n.15. The EPA in turn requires that the jobs be "substantially equal" in terms of the "skill, effort, and responsibility required," though even the EPA does not require that the jobs be "identical." *Id.* at 1533. This inquiry must be "focuse[d] solely on the primary duties of each job, not duties that are incidental or insubstantial." *Id.* Of course, all of this language, while helpful, does not convey with precision the proper

---

from the employees. The evidence in this case reveals that UAB is no exception. Therefore Mr. Crosby's failure to complain about his situation does not mean that it went unnoticed, and does not explain it away.

16

standard to be applied. To put some flesh on the bones of this analysis, the court turns to the facts of *Miranda*.

*Miranda* involved a woman's claim that she was payed less than men for her work as a buyer for a grocery store chain, and therefore implicated both Title VII and the EPA. The plaintiff performed essentially the same job as the chain's other buyers, except that she was assigned fewer items to purchase and fewer high-turn-over items than the others. This arrangement was apparently based on the company president's plan that another buyer would "handle the more difficult items because of his buying experience." *Miranda*, 975 F.2d at 1524. The defendant therefore contended that the plaintiff did not perform a job similar to that of the other buyers. The plaintiff argued, however, that "the number of products ordered [was] not determinative of the responsibility of the job." *Id.* at 1534. The plaintiff's direct supervisor apparently agreed and "considered her to be a 'full-fledged' buyer, one with as many responsibilities as the other buyers and whose salary should have been adjusted upward." *Id.*

Based on a comparison of the jobs at issue, the trial court granted summary judgment as to the EPA claim but denied the same motion as to the Title VII claim and after a trial awarded back pay. The Eleventh Circuit concluded that both of the plaintiff's claims were viable. The court held that a genuine issue of material fact existed regarding the plaintiff's ability to make out an EPA claim, apparently because "reasonable minds could differ on the inferences arising from" the testimony regarding plaintiff's responsibilities.[14]

---

[14] The court also noted that the plaintiff was ultimately reassigned more products to purchase, but also indicated that this was not necessary to the decision, noting that it was "far from clear that [the plaintiff] could not establish a prima facie [EPA] case . . . either from the beginning of her tenure as a buyer or from the date at which

*Id.* at 1534. The court had no difficulty concluding that the plaintiff also met the more "relaxed" test of similarity required for a Title VII claim, as her own testimony and that of others indicated that she "shared the same type of tasks as the other buyers." *Id.* at 1529. *Miranda* thus suggests that, if the core job tasks of the plaintiff and the comparators are the same and the responsibility and effort involved are comparable, a *prima facie* case can be made out even if the jobs differ in some respects.

Other courts have similarly found a Title VII *prima facie* case where the job tasks of the plaintiff and the comparators are similar, even though those tasks are performed under slightly different circumstances. For example, the Northern District of Illinois concluded that the job of a building code inspector could properly be compared to that of an electrical or plumbing inspector for Title VII *prima facie* case purposes. *Shinault v. City of Chicago*, 1987 WL 16902, at \*9-10. The court applied a "substantially similar work" test derived from the Fifth Circuit's *Pittman* decision, *id.*, and concluded that this test was met because

[e]ach inspector position entails roughly the same job tasks. Each inspector inspects new and existing buildings for health and safety hazards and for compliance with City ordinances and industry standards. The specific system within a building each inspector inspects depends upon his or her specialty - - Plumbing inspectors inspect water pipes . . . and the like; Code inspectors inspect the entire building to assure compliance with . . . building codes. All inspectors fill out reports and interact with building owners and tenants. In short, there are no substantial differences in the jobs performed by various inspectors to merit wage differential[s] on the grounds of dissimilar work.[15] These differences . . . are small enough that a reasonable

---

the number of products for which she was responsible was equal to" the other buyer's. *Id.* at 1534 n.19.

[15] The court went on to note, in a footnote, that the qualifications required for each position were roughly equivalent. *Id.* at \*12 n.15.

18

> factfinder could find the job tasks of the Code Inspector positions
> substantially similar.

*Id.* at *12. Likewise, the Eleventh Circuit has indicated that two employees who "performed accounting services at the division level," might be similarly situated enough to allow a *prima facie* case to be built even though the comparator worked with computer packages, "worked longer hours" than the plaintiff, and held a job which was "more technical." *Reichold Chemicals*, 988 F.2d at 1570-71 & n.4; *see also id.* at 1571 (suggesting that "such facts may not prove plaintiff's case, but they constitute circumstantial evidence sufficient to establish a prima facie case").

Putting the question of qualifications aside for later discussion, the court is convinced that there is a genuine issue of fact regarding whether the plaintiff can meet the similarity standard set out in these cases. The court notes first that most of the project coordinators spent a majority of their time working on renovation projects – i.e. doing exactly the same job the plaintiff did. It is also far from clear that the more complicated construction techniques these project coordinators were exposed to when they did work on ground-up construction significantly altered their actual job. A number of witnesses testified that the administrative tasks involved in interfacing with various service providers and end users, not technical involvement in construction details, was the project coordinator's primary job. The same basic administrative tasks were performed on all projects, despite the differing construction techniques used. Thus, viewing the evidence in the light most favorable to the plaintiff, it appears that the core tasks of the project

coordinators were the same whether a building was being newly constructed or remodeled.

Testimony also indicated that the two types of projects were comparable in terms of difficulty and responsibility. Although the complexities of new building construction added some wrinkles to the project coordinator's job, so too did the requirements of renovating a building which was still in use. Reasonable minds could differ over which type of project required the most skill, effort, and responsibility. For summary judgment purposes, then, the court must assume that work on renovation and new building projects, while not identical, involved the same basic tasks and responsibilities, and was equally demanding in both situations. As in *Miranda* and *Shinault*, under these circumstances the jobs are similar for Title VII purposes.[16]

### 2. Qualifications.

As already noted, however, this analysis does not account for the allegedly more advanced qualifications required for new building projects. Defendants in this case advance a detailed argument that Crosby's qualifications justify any pay disparity he may suffer from. They argue in essence that coordinating ground-up construction is a quantitatively different kind of job from coordinating renovations, thereby justifying a difference in pay between the coordinators who can do ground-up projects and those who cannot.

According to Mr. Garland, the head of UAB's facilities group, new building projects involve problems with foundation, structure, exterior walls, and other construction elements

---

[16]The court assumes that the same standards govern claims under section 1983.

20

which are generally not implicated in renovations. In order to properly perform their job of monitoring the progress and quality of the construction on these key portions of the building, the project coordinators must understand how the construction of these elements work, including the various type of systems involved, what they look like on a drawing and in real life, and what problems arise with each. This information, in turn, can be gleaned only from certain specialized building courses and, perhaps, from long experience with new building construction. The undisputed evidence establishes that Crosby has neither, and he therefore does not perform and is not qualified to perform the valuable and sophisticated job of coordinating a new building construction. He is therefore paid less than project coordinators who can do this type of work.

Arguments of this type are frequently advanced in response to unequal pay claims. As the extensive pay discrimination caselaw built up under the EPA indicates, qualifications may explain away an otherwise suspicious pay differential. The basic requirements for a given job, or the "skills and qualifications actually needed to perform" it, *Miranda*, 975 F.2d at 1533, can be expected to affect pay. Particular jobs may by their nature require more advanced training, education, or experience than other jobs. Whatever the other similarities between jobs in terms of basic tasks and responsibilities, it is normal and natural that a job which requires more advanced credentials would carry a higher price tag in order to attract employees with those credentials. Thus if jobs require different skills and qualifications, they are not "similar" within the meaning of the EPA, and a pay comparison between them cannot be used to make out a *prima facie* case. *Id.* Defendants argue that this is precisely the situation here.

Ordinarily, the court would be entirely satisfied with this explanation. The court takes seriously the admonition that federal courts should not interfere in the business decisions of employers. Thus, whatever the testimony may ultimately be about the accuracy of UAB's assessment of what project coordinators actually do and the level of education required to do it, this is really not the issue. UAB is free to make its own decisions about the qualifications it requires of project coordinators, and to adjust their pay accordingly. This is true whether or not another employer might find the same requirements excessive and unnecessary. Thus if UAB uniformly imposed relevant education and experience requirements, the court would readily conclude that Crosby could neither state a *prima facie* case against the defendants nor prevail on the ultimate issue of discrimination.

The defendants have not established that this is the situation here, however. Mr. Garland's explanation of the pay disparity directly conflicts with the record on a number of points, raising a genuine factual question about the accuracy of his explanation. For example, Garland places much of the responsibility for Crosby's pay level on Braswell and Dean. According to Garland, Braswell essentially selected the project coordinator's pay levels, Braswell recommended that Crosby be paid less than the other coordinators, and Braswell and Dean indicated that they could not and would not assign Crosby to new building projects. But Braswell and Dean categorically deny all of this, making the soundness of Garland's explanations essentially a credibility choice which must be left to a jury.

22

Plaintiff's evidence also undercuts Mr. Garland's testimony in another respect. While Garland testified in great detail about the technical demands of the project coordinator job and the education and experience he felt would be necessary to perform it, the record suggests that most of the project coordinators were missing some of these requirements and one, Morgan, had almost none of them. Morgan was nevertheless allowed to coordinate major ground-up projects.[17] Even more significantly, according to Braswell and Dean, Garland *never told them that Crosby himself should not be allowed to coordinate ground-up projects*. Thus the record raises doubts about whether Garland ever did anything to ensure that coordinators on ground-up projects had the qualifications he now claims were necessary. This factual dispute in turn casts a shadow over his explanations which cannot be ignored at the summary judgment stage. Job requirements which are not consistently applied cannot be considered in evaluating the plaintiff's claims. *See, e.g., Lane v. Ogden Entertainment*, 13 F. Supp. 2d 1261 (M.D. Ala. 1998); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635 (11th Cir. 1998) (scrutinizing the defendant's asserted qualifications); *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994) (cautioning that "greater scrutiny" should be applied to unwritten job criteria). The court

---

[17] Defendants attempt to explain this away by suggesting that Morgan's personnel documents, and Braswell and Dean, misled Garland into thinking that Morgan had the requisite qualifications. Braswell and Dean of course deny any involvement in the whole subject of qualifications, claiming it was never an issue. Therefore, at least for summary judgment purposes, the blame cannot be laid at their feet. As for Morgan's personnel documents, while they do not unequivocally establish that Morgan did not have Garland's preferred qualifications, they do not indicate that he did either. While Garland might have been mistaken, in the court's view a jury could reasonably infer that Garland may not have taken the qualifications requirement very seriously if he failed to assure himself that Morgan was in fact qualified before hiring him and allowing him to work on major projects.

therefore concludes that Crosby's lack of formal qualifications do not bar his *prima facie* case.[18]

### 3.    Pretext.

For the same reasons, the record raises genuine questions about the pretextual nature of defendants' ground-up/renovation distinction. Nor is the court persuaded by defendants' other attempts to explain Crosby's pay rate. Defendants seem to suggest in their submissions that Crosby may have been paid less just because he had less education and experience than some of the other project coordinators. In other words, even if he could coordinate new building projects it might make sense to pay him less because of his inferior education and experience. This might be a fine explanation, except that none of the UAB officials who testified advanced it. Garland, who the court must assume served as the key decisionmaker, instead focused in great detail on the new building/renovation distinction. Assertion of this new reasoning would be inconsistent with his previous testimony, casting doubt on both explanations. The defendants cannot now substitute a different explanation in place of Garland's testimony and prevail on summary judgment.

The defendants' attempts to draw a distinction between Crosby and Morgan suffers from a similar problem. Defendants explain away the disparity between Crosby's pay and

---

[18] The court notes that only claims that a particular job by its nature requires different qualifications and so different pay may be considered at the *prima facie* stage. Differences in the individual qualifications of particular employees may be raised by a defendant to explain a pay disparity, but do not negate the *prima facie* case. *See Miranda*, 975 F.2d at 1532 (discussing the EPA *prima facie* case); *see also Mulhall*, 19 F.3d at 598 (if plaintiff makes out an EPA *prima facie* case, this necessarily includes a Title VII *prima facie* case as well); *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998) (discussing in general the problems with including comparative qualifications in a Title VII prima facie case). Thus defendants' argument that Crosby was simply less qualified, discussed below, may serve as a legitimate nondiscriminatory reason for action but will not bar his *prima facie* case.

24

Morgan's based on Morgan's status as a temporary employee. They claim that Morgan was paid more than Crosby to compensate for the lack of benefits and stability inherent in his temporary position. Some evidence in the record, and most particularly the fact that Morgan's pay was not altered when he ultimately became a permanent employee, raise questions about this explanation. Most importantly, however, UAB's treatment of Morgan bears not just on the pay disparity between himself and Crosby, but between Crosby and *every other project coordinator.* The defendants erected the new building/renovation distinction to defend against Crosby's complaint that *all* of the project coordinators were paid more than he was. Thus if Morgan was in fact allowed to work on new buildings without the required qualifications, the defendants' entire theory of the case would be cast into doubt. Viewing the evidence in the light most favorable to the plaintiff, this appears to be the case.

A factual dispute therefore exists as to whether the other project coordinators were held to the same standard that the defendants now attempt to apply to Mr. Crosby. Testimony by others, and particularly by Braswell and Dean, contradicts Mr. Garland's explanations on many points. Serious questions are therefore raised about the candor of Mr. Garland's testimony and, if he was less than candid, his motivation for hiding the true reasons for Crosby's pay rate. It thus appears to the court that the resolution of the case may come down in the end to a swearing match between Garland on the one hand and Braswell and Dean on the other. This court cannot determine the outcome of such a match, so the task must be left to a jury. Defendants' summary judgment motion will therefore be denied.

25

## B.   QUALIFIED IMMUNITY.

Defendant Garland also contends that any claims against him individually are barred by the doctrine of qualified immunity. This court previously accepted this argument, and granted Mr. Garland's motion to dismiss and/or for summary judgment. However, the court has now found it appropriate to reconsider that decision in light of later precedent, most importantly the Supreme Court's recent decision in *Crawford-El v. Britton*, 118 S. Ct. 1584 (1998). The parties have been given an opportunity to further brief the question, and the issues presented are now ripe for decision. Upon due consideration, the court will withdraw its previous order and deny Mr. Garland's request for a dismissal based on qualified immunity.

### 1.   The Basic Framework.

A thorough analysis of the parties' arguments will require a review of the development of qualified immunity doctrine. The basic qualified immunity framework is familiar and well-established. Eleventh Circuit precedent sets up a stringent standard for a plaintiff to meet in order to avoid dismissal based on qualified immunity. If the defense applies, individual defendants will be "immune from liability and even from trial." *See Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992), *cert. denied sub nom, Deutcsh v. Oladeinde*, 507 U.S. 987, 113 S. Ct. 1586, 123 L. Ed. 2d 153 (1993).

A government official's bad faith or subjective awareness that his course of action may be illegal will not negate the qualified immunity defense. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). Recognizing that "[t]here are special costs to 'subjective' inquiries of this kind," *id.* at 816, the Supreme Court in

*Harlow* "purged qualified immunity doctrine of its subjective components." *Mitchell v. Forsyth*, 105 S. Ct. 2806, 2811 (1985). The proper inquiry is instead an objective one, and the defense will apply unless the unlawfulness of the defendant's action would have been apparent to any reasonable official. *See Harlow*, 457 U.S. at 816; *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986) (Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."). Thus only "the objective reasonableness of an official's conduct is relevant." *Harlow*, 457 U.S. at 818. To prevail against the defense "'the plaintiff must . . . demonstrate that the defendant violated [ the] law based upon objective standards.'" *Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1282 (11th Cir. 1998) (quoting *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997)).

As a corollary to this principle, the courts have required that the law allegedly violated must have been "clearly established" so that a reasonable official could properly be charged with knowledge of it. *See, e.g., id.* In determining whether the law is clearly established, the relevant inquiry is "fact specific," *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994), and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994); *see also Cofield v. Randolph County Comm'n*, 90 F.3d 468, 470 (11th Cir. 1996). As emphasized in *Lassiter*, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violated federal law in the circumstances." *Id.*; *see also Anderson*

*v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)(holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). The Eleventh Circuit has warned that plaintiffs must not be permitted "to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" *Id.* at 1150. "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.* (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994)); *see also Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (en banc).

## 2.    A Crack in the Foundation.

These requirements impose heavy burdens on a plaintiff's case, but (at least in theory) allow for a rather straight-forward analysis by the court. The qualified immunity inquiry in this case, however, is further complicated by what Judge (now Justice) Ruth Bader Ginsburg has described as a "fault or vulnerability in the . . . law of qualified immunity." *See Martin v. D.C. Metropolitan Police* Dept., 812 F.2d 1425, 1432 (D.C. Cir. 1986) (Ginsburg, J.); *see also McMillian v. Johnson*, 101 F.3d 1363, 1367 (11th Cir. 1996) (Propst, J., sitting by designation and concurring specially). As the discussion above reveals, qualified immunity doctrine has two thrusts, one designed to ensure that the court does not delve into the murky waters of subjective intent, the other to ensure that officials are not caught off-guard by changes in the shifting legal landscape. These principles are closely linked, and originated together in *Harlow*. Typically, they work in tandem. However, as a number of observers have pointed out, these principles may come into

28

conflict in cases in which the key element of plaintiff's claim involves the intent of the government official. *See, e.g., Martin*, 812 F.2d at 1432; *see also McMillian*, 101 F.3d at 1367.

In many situations, case law has staked out broad areas of action in which an official's conduct is entirely legal, if taken with proper motive, but equally clearly illegal, if a wrongful motive is implicated. In such cases, it cannot seriously be argued that a reasonable official would not have known that the action taken, if taken solely on the basis of an improper motive, would be illegal or unconstitutional. Thus, at least if the "clearly established" nature of the violation is the crucial qualified immunity inquiry, the official's "intent or purpose, not [his] specific conduct, may be the appropriate issue to focus upon if the inappropriateness of such intent or purpose has been clearly established." *McMillian*, 101 F.3d at 1367.

On the other hand, rejecting the defense because of discriminatory intent, a wholly subjective inquiry, seems to run afoul of *Harlow*'s admonition that qualified immunity should be assessed on a purely objective basis. The "special costs" required to litigate subjective issues, *Harlow*, 457 U.S. at 816, and most particularly the need for discovery and often a jury trial to resolve these heavily factual questions, *see id.*, are imposed on defendants whether or not the relevant intent is one substantively prohibited by the Constitution. The Supreme Court in *Harlow* pointed specifically to such costs as a problem which had to be addressed in order to provide sufficient protection to government officials facing the threat of a lawsuit. *See id.* at 816-818. Thus, as a number of courts have concluded, there is clearly some tension between *Harlow*'s logic and any rule which allows

allegations of subjective intent to bypass the qualified immunity defense. *See, e.g.,* *Crawford-El v. Britton*, 93 F.3d 813 (D.C. Cir. 1996). But, as discussed above, many types of substantive claims call for just such an evaluation of intent. "The 'clearly established law' and 'objective reasonableness' facets of . . . qualified immunity doctrine tug in opposite directions where . . . the 'clearly established law' itself contains a subjective component." *Mitchell*, 812 F.2d at 1432.

This case falls neatly into this fault line between the two competing qualified immunity principles. Literally hundreds of reported cases have established the proposition that racial discrimination in government employment is forbidden by the Constitution and laws of the United States. "It is beyond doubt that the principal right allegedly violated by the defendants [here] -- the equal protection right to be free from intentional racial discrimination -- was clearly established" during the relevant time period. *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991). As the discussion above reveals, the plaintiff has presented sufficient evidence to justify an assumption on summary judgment that such was the case, therefore apparently mandating a jury trial. However, such a result would strip Mr. Garland of the protections of qualified immunity and send him to trial because of an entirely subjective allegation.

### 3.     The Eleventh Circuit's Approach.

This problem has long troubled many federal courts, including the Eleventh Circuit. Most courts faced with the problem eventually concluded that, despite *Harlow*'s objective approach, some room must be made in qualified immunity doctrine for a subjective inquiry when intent is an element of the underlying constitutional claim. The Eleventh Circuit was

30

no exception, and held "as every Circuit that has considered this issue has held, that where subjective motive or intent is a critical element of the alleged constitutional violation the intent of the government actor is relevant" to the qualified immunity assessment. *Walker v. Schwalbe*, 112 F.2d 1127, 1132 (11th Cir. 1997); *see, e.g., Mencer v. Hammonds*, 134 F.3d 1066, 1070-71 (11th Cir. 1998); *McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996); *Ratliff v. DeKalb County*, 62 F.3d 338, 341 (11th Cir. 1995); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995).

On the other hand, however, many appellate courts were also unwilling to allow a garden variety claim of intent to defeat qualified immunity, and crafted specialized standards to give some weight to subjective intent while protecting the interests served by the qualified immunity defense. *See, e.g., Crawford-El*, 93 F.3d at 813 (requiring a plaintiff to prove intent by clear and convincing evidence); *Martin*, 812 F.2d at 1435 (requiring a plaintiff to come forward with direct evidence of discriminatory intent in order to defeat a qualified immunity claim). Again, the Eleventh Circuit followed suit, and in *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996) "attempted to strike a balance in cases in which intent is an element of the underlying claim." *McMillian*, 101 F.3d at 1368.

The decision in *Foy*, which formed the basis of this court's prior ruling in favor of Mr. Garland, recognized that intent must be considered "where intent is an element of the constitutional tort" and that "matters of intent are often jury questions," *Foy*, 94 F.3d at 1535 n.9, but also refused to "rule out qualified immunity wherever discriminatory intent appears in the summary judgment record." *Id.* at 1533. In an attempt to "take into account subjective intent and, at the same time, . . . to advance and give credit to the principles

31

which the Supreme Court has repeatedly said justify qualified immunity," *id.* at 1535 n.8, the court adapted the causation principles set out by the Supreme Court in *Mt. Healthy v. Doyle*, 429 U.S. 274 (1979) "to the qualified immunity context."[19] *Id.* at 1535 n.8. *Mt. Healthy* and its progeny establish that an action taken with an unconstitutional motive may nonetheless be constitutional if the defendant can prove that the same action would have been taken in the absence of the tainted motive. *Foy* reasoned that, even when a plaintiff can prove intent, the presence of a possible *Mt. Healthy* defense "can cloud the question of whether the official acted lawfully or unlawfully in the circumstances." *Foy*, 94 F.3d at 1534. This cloud may make it unclear whether the official acted in violation of established law, raising doubts which in turn justify an award of immunity. *Id.* at 1534-35 & nn.8-9. Thus according to *Foy*, "where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." *Id.* at 1535.

In discussing the specific facts before it, the *Foy* court further fleshed out the contours of this rule. *Foy* appeared to impose two requirements on defendants seeking the protection of qualified immunity despite evidence of unlawful intent. First, *Foy* clearly

---

[19] It is important to note that the *Foy* decision did not simply apply the unadorned *Mt. Healthy* standard to the facts of the case, a procedure of unquestioned appropriateness. *Foy* recognized that "*Mt. Healthy* is not a case about qualified immunity. [It] teaches about causation when the merits of the claim are to be decided." *Id.* at 1535 n.8. However, the *Foy* court never reached the merits of the constitutional claim at issue, noting specifically that it "did not (and need not) decide that Defendants could not possibly be liable if the case were fully litigated to a conclusion on the merits, that is, if immunity were no issue at all in the case." *Id.* Instead, the court applied a new, modified version of the *Mt. Healthy* principles at the qualified immunity stage, in order to protect the government officials involved from the burdens of trying an intent question like that posed by a *Mt. Healthy* defense on the merits.

32

required defendants to point to "adequate lawful reasons" for the actions taken, in other words reasons persuasive enough that "[n]o jury could find that it would have been unlawful for an [official] to do as defendants did" based on such reasons and "[m]ore important, no jury could find that reasonable [officials] would never have done the things defendants did but for discriminatory intent." Second, *Foy* seemed to require a showing, made within the factual constrictions of summary judgment, that defendants "were actually motivated by lawful considerations," at least in part. *Id.* at 1535. Admittedly, however, this aspect of the *Foy* decision is not entirely clear, and a plausible argument could perhaps be made that the objective reasonableness and adequacy of defendant's asserted legitimate motive was *Foy*'s only concern.[20]

A subsequent Eleventh Circuit decision addressed the same issue, and while following *Foy*'s logic cast further doubt on the proper approach to Foy's mixed motive requirement. Summing up *Foy* as requiring the "existence of an indisputable and adequate lawful motive," the court in *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1379 (11th Cir. 1997) immunized defendants because the evidence offered "conclusive support for the defendants' claimed adequate lawful motives." The court's reliance on *Foy* seems to imply a requirement that an actual legitimate motive must be present, and indeed nothing in *Johnson* directly contradicts this interpretation.

---

[20]The parties debate whether this requirement can properly be read into *Foy*. The court suspects that it can, as *Foy* formulated a rule applicable to a case in which "the facts assumed *for summary judgment purposes* . . . show mixed motives," *id.* at 1535, and acknowledged that the question for qualified immunity "cannot just be whether some official, acting without discriminatory intent, could have lawfully acted as Defendants acted." *Id.* at 1535 n.9.

On the other hand, as both parties acknowledge, the *Johnson* decision focused on the external evidence supporting the defendants' explanation, not on any evidence of actual intent. *See id.* The *Johnson* decision then found it sufficient that "the law did not clearly establish that a reasonable official faced" with the same circumstances "should not have [acted] in the same manner." *Id.* This language appears to contemplate an entirely objective assessment of an official's asserted legitimate reasons for action, without regard to proof of the actual intent. Such an approach might conflict with the rule established in *Foy*, though ambiguities in both *Foy* and *Johnson* make it somewhat difficult to determine whether the two decisions are in agreement on this question. Thus the Eleventh Circuit's approach to the qualified immunity/intent question remains somewhat uncertain.

### 4. *Crawford-El v. Britton.*

Faced with an array of similarly uncertain appellate court solutions to the same puzzle, the Supreme Court granted *certiorari* to review the decision of the United States District Court for the District of Columbia in *Crawford-El v. Britton*, 93 F.3d 813 (D.C. Cir. 1996). In *Crawford-El*, a fragmented D.C. Circuit, sitting *en banc*, considered the proper approach to constitutional claims brought against individual government officials and involving elements of intent. A slim majority of the court concluded that plaintiffs in such cases should be required to prove intent by clear and convincing evidence. Judge Silberman concurred in the result, but proposed a different standard, one "close to the holding in *Foy*," *McMillian*, 101 F.3d at 1369, and even closer to the approach apparently followed in *Johnson*. Under Judge Silberman's proposed rule, "when the defendant asserts a legitimate motive for his or her action, only an objective inquiry into the pretextuality of

34

the assertion is allowed. If the facts establish that the purported motivation *would have been reasonable*, the defendant is entitled to qualified immunity." *Id.* at 834 (Silberman, J., concurring) (emphasis added). The Supreme Court therefore granted *cert* to consider both the ruling of the majority below and the question of whether qualified immunity should apply if an official asserts a legitimate reason which "'would have been a reasonable basis for the act, even if evidence . . . shows the official's *actual* reason for the act was unconstitutional.'" *Crawford-El v. Britton*, 118 S. Ct. 1584, 1598-99 (1998) (Rehnquist, C.J., dissenting) (quoting the petition for certiorari) (emphasis added).

After a careful review of the ruling of *Harlow* and the principles underlying it, the Court in *Crawford-El* determined that plaintiffs could not properly be held to higher standards of proof simply because they brought their claims against individual government officials. *Id.* at 1594. According to the Court, a proper balance between the interests in vindicating constitutional rights and those served by *Harlow*'s immunity standard did "not justify a rule that places a thumb on the defendant's side of the scales when the merits of a claim . . . are being resolved." *Id.* at 1594. More importantly for our purposes, perhaps, a majority of the Court went on to reject proposals by four dissenting Justices that the Court adopt a rule similar to Judge Silberman's. Drawing on its discussion of "the policy concerns underlying *Harlow*," the Court concluded that *Harlow* and its principles did not support these new proposals. *See id.* at 1592 n.11 & 1594. Thus, while providing only limited additional discussion, the Court clearly rejected any argument that qualified immunity could do indirectly what the Court had already held that the appellate courts could not do directly, i.e. limit inquiry into an official's motives by "immuniz[ing] . . . .

officials whose conduct is 'objectively valid,' regardless of improper intent." *Id.* at 1594 (quoting *id.* at 1603 (Scalia, J., dissenting)).

## 5. The Parties' Contentions.

Having gone the long way round to explain the background of the parties' dispute, the court is now in position to address their arguments directly. In a nutshell, Mr. Garland argues that he has presented evidence of a legitimate justification for Crosby's pay disparity, that under a proper interpretation of the *Foy/Johnson* line of cases such a justification should result in immunity regardless of any question of actual intent, and that *Crawford-El* did nothing to change this result.[21] The plaintiff in turn contends that serious questions have been raised about Garland's commitment to the legitimate reasons he now advances for his actions, that *Foy* requires a defendant to show that he was actually motivated by a lawful motive to earn immunity, and that any other interpretation of *Foy* and *Johnson* would run afoul of *Crawford-El*.

The court is persuaded by plaintiff's arguments, and so feels compelled to reverse its prior decision and reinstate the plaintiff's claims against Mr. Garland. As *Foy* made clear, the proper inquiry in assessing a qualified immunity argument is always the same:

---

[21] The defendant also contends that a more recent Eleventh Circuit case further adjusted the burdens of proof in race discrimination cases, requiring a plaintiff to prove not just pretext but actual "racial animus" in order to go to a jury on an equal protection claim against a government official. *See Brown v. Cochran*, 1999 WL 193884, at *4 (11th Cir. April 8, 1999). The court notes that such a ruling would conflict with established Eleventh Circuit precedent which indicates that the Title VII proof framework applies in constitutional race cases and that proof of pretext allows a jury to infer discrimination and so is a sufficient basis to reject summary judgment. The court also notes that *Brown* did not indicate any intention to change long-standing law, purporting instead merely to apply settled principles to the merits (not to the qualified immunity defense) of an equal protection claim. *See id.* While *Brown* may have used some unusual language in setting out these familiar standards, the court suspects that more fanfare would have been involved in a change as substantial as that advocated by the defendant. The court therefore concludes that *Brown* is exactly what it appears to be – a straight-forward, if vigorous, application of ordinary principles to eliminate a plaintiff's unsupported claim of intent.

"Could a reasonable officer have believed that what the defendant did might be unlawful in the circumstances and in the light of the clearly established law." *Foy*, 94 F.3d at 1534. The crux of the parties' dispute, however, revolves around what "circumstances" can properly be considered in making this assessment, and in particular how factual questions of intent figure into these "circumstances." *See also id.* at 1535 n.9 (unlawful intent "can be part of the circumstances which we are forced to consider"). The court suspects that *Foy* and perhaps even *Johnson* allow a subjective inquiry into the actual motivations underlying an official's action. At least under this court's understanding of Eleventh Circuit precedent, the availability of a reasonable and legitimate explanation for a government actor's choice is not sufficient to provide immunity if evidence suggests that the choice was not in fact motivated by the reasons given. Thus the subjective inquiry simply cannot be avoided, at least where the plaintiff can come forward with colorable evidence of pretext.[22]

The court's conclusion is further bolstered by the Supreme Court's ruling in *Crawford-El*, which squarely rejected proposals to limit the pretext inquiry to objective evidence. Thus even if the court has misread Eleventh Circuit caselaw on this point, Supreme Court precedent no longer allows[23] an examination of Mr. Garland's legitimate explanation which does not take into account his actual commitment to the reasoning he

---

[22] In other words, *Foy* apparently applies only to so-called "mixed motive" cases, *see Foy*, 94 F.3d at 1535, not to cases in which a question remains about whether the legitimate reason advanced was involved in the decision at all.

[23] In fact, the court harbors some suspicions that, to the extent *Foy* and *Johnson* impose any additional burdens on a plaintiff seeking to prove the intent of a government actor, they are inconsistent with the principles set out in *Crawford-El*. However, *Crawford-El* did not squarely face the issues posed in these cases, at least as this court understands them, nor is it necessary to do so here. This case does not present undisputed evidence of an adequate lawful motive which actually motivated the relevant government official. Instead, Garland's motivations are hotly contested. The court will therefore leave the fate of *Foy* and *Johnson* for resolution by a later decision, hopefully from the Eleventh Circuit itself.

37

now advances. As the discussion above reveals, a jury question has been presented regarding that commitment. Therefore neither dismissal nor summary judgment is appropriate. The court will therefore reinstate the plaintiff's claim against Mr. Garland and allow that claim to proceed to trial.

## VI.   CONCLUSION.

The defendants' motion for summary judgment will be denied. The court has reconsidered defendant Garland's motion to dismiss and/or motion for summary judgment on the claims against him in his individual capacity. Upon reconsideration, defendant Garland's motion will also be denied. The court will enter an appropriate order in conformity with this memorandum opinion.

Done, this __26th__ day of May 1999.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

38